UNITED STATES BANKRUPTCY COURT
DISTRICT OF MAINE

In re:

Kenneth W. Cinq-Mars
& Gisele R. Cinq-Mars,

Debtors

Chapter 13
Case No. 16-10654

## MEMORANDUM OF DECISION

Kenneth and Gisele Cinq-Mars seek confirmation of their First Amended Chapter 13 Plan. [Dkt. No. 12.]  Camden National Bank has filed two proofs of claim in the case, and has objected to confirmation.  [Dkt. No. 14.]  The bank's proofs of claim relate to mortgages on the debtors' principal residence.  *See* [Proof of Claim Nos. 5 & 6].  The parties' dispute is fixed on the bank's second proof of claim, a claim for $24,700.95 secured—at least under applicable state law—by a second priority mortgage on the residence.  *See* [Proof of Claim No. 6].  Mr. and Mrs. Cinq-Mars believe that, for bankruptcy purposes, this claim is entirely unsecured and may be treated as such under their plan.  For its part, the bank believes that there is at least some equity in the property, after deducting the senior liens, such that the second mortgage cannot be stripped off.  The question, then, is whether the debtors' plan impermissibly modifies the bank's rights.

I. FINDINGS OF FACT

At trial on June 1, 2017, three witnesses testified and three exhibits were admitted in evidence.  Based on the testimony admitted at trial, the exhibits, and the parties' stipulation [Dkt. No. 24], the Court finds the following facts.

The debtors and their adult daughter currently reside in a house located at 11 Deer Ridge Road, Wiscasset, Maine.  The debtors purchased two acres of unimproved land in 2005 and then

constructed their house on the land.  They have lived in the house continuously since May 2007 and have not made any improvements to the house since they built it.  There is a total of 2,472 square feet of finished living space in the house.  There are three bedrooms and two bathrooms, and a two-car garage is built into the footprint of the house, occupying much of what could be considered the first floor of the structure.  The kitchen and living areas are on the second floor, and the bedrooms are on the third floor.  There is some water damage to some of the exterior trim, and the deck – made of pressure-treated lumber – has endured several years of Maine weather.  There is black mold in the attic and in or near one of the bathroom skylights.

When the debtors filed their petition on October 31, 2016, the property was subject to the bank's first mortgage securing a debt of $236,413.03, and statutory liens securing real estate taxes in the amount of $13,809.09.  These liens are senior to the bank's second mortgage.  The total amount of senior liens, as of October 31, 2016, was $250,222.12.  Even with the issues mentioned above, the value of the property exceeds $250,222.12.

The debtors' plan provides for the cure of defaults and the maintenance of current payments on the bank's first mortgage.  *See* [Dkt. No. 12, ¶ 3(B)(1)]; *see also* [Proof of Claim No. 5].  The plan also provides the following:

> **CAMDEN NATIONAL BANK holds a mortgage on debtor's Wiscasset, Maine real estate.  The mortgage, recorded in the Lincoln County Registry of Deeds at Book 4169, Page 208 shall be stripped off the debtor' real estate and discharged upon completion of the Chapter 13 Plan.  Said discharge shall be recorded in the Lincoln County Registry of Deeds.  An attested copy of the court Order confirming the debtor's Chapter 13 Plan together with a copy of the Debtor's discharge order shall serve to discharge the mortgage of CAMDEN NATIONAL BANK recorded in the Lincoln County Registry of Deeds at Book 4169, Page 208.**

[Dkt. No. 12, Attachment A: Schedule V.]  This is the part of the plan that has drawn the bank's objection.

## II.  CONCLUSIONS OF LAW

Section 1322(b)(2) of the Bankruptcy Code provides, in part, that a chapter 13 plan may "modify the rights of holders of secured claims, *other than a claim secured only by a security interest in real property that is the debtor's principal residence . . . .*"  11 U.S.C. § 1322(b)(2) (emphasis added).  Stripping a lien modifies the lienholder's rights.  Is the bank the holder of "a claim secured only by a security interest" in the debtors' residence, such that section 1322(b)(2) prohibits the modification sought by the debtors?

The answer can be found in section 506, which determines the secured (or unsecured) status of claims in bankruptcy.  *See* 11 U.S.C. § 506(a); *see also* 11 U.S.C. § 103(a) (making chapter 5 of the Code applicable to cases under chapter 13); Nobelman v. Am. Savs. Bank, 508 U.S. 324, 328 (1993) (approving resort to section 506(a) for a judicial valuation of collateral to determine the status of a claim in a chapter 13 lien strip dispute); Woolsey v. Citibank, N.A., (In re Woolsey), 696 F.3d 1266, 1279 (10th Cir. 2012) ("Nobelman . . . can be read to suggest that for a claim to be 'secured' and therefore trigger the antimodification clause in § 1322(b)(2), it must be supported by at least some value in the collateral – just as § 506(a) . . . says.").  Section 506(a) provides in part that:

> An allowed claim of a creditor secured by a lien on property in which the estate has an interest . . . is a secured claim to the extent of the value of such creditor's interest in the estate's interest in such property . . . and is an unsecured claim to the extent that the value of such creditor's interest . . . is less than the amount of such allowed claim.

11 U.S.C. § 506(a)(1).

In Nobelman, the Supreme Court held that section 1322(b) prohibits a chapter 13 debtor from stripping a lien on the debtor's principal residence if the residence has value to which the lien attaches, even if that value would lead to bifurcation of the claim under section 506(a).  508

U.S. at 325-26.  Nobelman did not determine whether section 1322(b) also prohibits a chapter 13 debtor from stripping off a lien against the debtor's principal residence when the claim related to that lien is entirely unsecured under section 506(a).  *See* id.  The First Circuit Court of Appeals has yet to decide whether section 1322(b) prohibits modifying a lien against a debtor's principal residence when the related claim is entirely unsecured within the meaning of section 506(a).  However, the First Circuit Bankruptcy Appellate Panel has joined the majority view on the issue, and concluded that section 1322(b)(2) allows a chapter 13 debtor to strip off a lien on her principal residence if the claim associated with that lien is wholly unsecured under section 506(a).  Domestic Bank v. Mann (In re Mann), 249 B.R. 831, 840 (B.A.P. 1st Cir. 2000).

In this contested matter, the bank has not argued that section 1322(b)(2) prevents the debtors from stripping off a lien that is entirely unsecured.  Instead, it has contended that its second mortgage is at least partially secured, and is therefore protected under Nobelman.  The Court need not decide whether section 1322(b)(2) permits the debtors to strip off a wholly unsecured lien against their principal residence.  Here, where the value of the property exceeds the amount of the senior liens, the bank's second mortgage is at least partially secured and therefore cannot be stripped down.[1]  Nobelman, 508 U.S. at 325-26.

The Court's determination of the value of the property is based primarily upon the testimony of Thomas Painter, a licensed real estate appraiser.  After inspecting the property, talking with Mr. Cinq-Mars, and identifying three comparable properties in Wiscasset, Mr. Painter concluded that the property was worth $270,000.  In arriving at this conclusion, Mr.

---

[1] At trial, neither party argued about the valuation date, and neither party introduced any evidence suggesting that the value changed between the petition date and the date of the confirmation hearing.  In fact, each party offered evidence of a relatively stable real estate market.  On this record, the Court is not required to decide whether the property should be valued as of the petition date or some other date.  *Cf.* In re Guerra, No. 16-40121-CJP, 2017 WL 1190604, at **4-5 (Bankr. D. Mass. Mar. 29, 2017) (determining the proper date for valuing real property in a lien strip dispute when there was some indication that the property had appreciated in value after the petition date).

- 4 -

Painter used a sound methodology consistent with Uniform Standards of Professional Appraisal Practice. He testified credibly about his approach and how he arrived at his conclusion of value. Although the Court has doubts that the property is, in fact, worth as much as $270,000, Mr. Painter's testimony was more persuasive than the testimony offered by the debtors.

At trial, the Cinq-Mars attempted to counter the bank's valuation evidence by pointing to an issue with the property's septic system. Mr. Cinq-Mars and the debtors' expert, Sherri Dunbar, each testified – at least perfunctorily – about this issue. Mr. Cinq-Mars testified that the leach field had "failed" and that the septic system needed to be replaced. He did not testify about the extent of the failure, the cost of repairs, or the extent to which the problems interfered with his family's use of the property. Ms. Dunbar, a real estate broker, testified that when she inspected the property in the fall of 2016, she noticed some dampness near the septic system and told Mr. Cinq-Mars that the dampness was not normal. She testified that the issue with the septic system had affected her opinion of value. This was the extent of the debtors' evidence regarding the septic system.

The debtors did not present any evidence regarding the cost of repairs to the septic system, and they made no explicit attempt to quantify the extent to which the septic system issues depressed the value of the property.[2] Instead, they relied on Ms. Dunbar's opinions that the property, in excellent condition, would be worth $250,000, but was worth $230,000 or less in its current condition. Ms. Dunbar did not adequately explain what aspects of the property's current condition caused her to discount its value, or exactly how she calculated the discount of

---

[2] It appears that the debtors' failure to present any evidence about the cost of repairs was the product of a deliberate choice. Before trial, the debtors identified a potential witness to testify about the necessity and approximate cost of the repairs to the septic system. *See* [Dkt. Nos. 28 & 29]. At trial, the identified witness did not appear. The debtors did not explain his absence and they did not present any other evidence—beyond the generalized testimony of a real estate broker—regarding the cost of repairs.

approximately $20,000.[3]  Consequently, the Court is unable to determine the extent to which problems with the septic system might affect the property's value.

Ms. Dunbar's opinion of value suffered in other respects as well.  At trial, she testified that she completed two comparative market analyses of the property – one in October 2016 and the other in April 2017.  In each analysis, she relied on sales of comparable properties, making adjustments that she deemed necessary to arrive at the value of the debtors' property.  The October analysis was based on five comparable properties, with a low price of $211,500, a high price of $283,500, and an average price of $258,000.  The April analysis was also based on five comparable properties, with a low price of $186,000, a high price of $299,000, and an average price of $233,480.  Despite material differences in the comparable sales used in each analysis, she concluded that the property was worth $230,000 in both.  Her explanation for this discrepancy was not persuasive.

Both of Ms. Dunbar's comparative market analyses included average price per square foot calculations.  The comparable properties that Ms. Dunbar used in her April 2017 analysis had an average sales price per square foot of $113.74.  The comparable properties that she used in her earlier analysis had an average sales price per square foot of $104.30.  If the 2,472 square feet of finished living space in the debtors' home is multiplied by $113.74, the calculation yields a value of $281,165.  If the calculation is repeated with the lower price per square foot from Ms. Dunbar's October 2016 analysis, the calculation yields a value of $257,830.  Neither Ms. Dunbar nor Mr. Painter used a price per square foot analysis to arrive at valuation, and the Court

---

[3] At one point, Ms. Dunbar testified that "if the property were in pristine condition and there were no issues with the septic, it would probably be worth $250."  Later, she explained, in more general terms, that she thought the property was worth $230,000 due to deferred maintenance and issues with the siding.

recognizes that methodology is not the only, or even the best, way to value real estate. These calculations do, however, cast some doubt on the reliability of Ms. Dunbar's opinion of value.

Although there is evidence in the record that supports the debtors' position, the Court finds that Mr. Painter's testimony was the most credible and persuasive indication of the property's value. The Cinq-Mars bore the ultimate burden of establishing entitlement to confirmation by a preponderance of the evidence. *See* In re Bradley, 567 B.R. 231, 236 (Bankr. D. Me. 2017). They were unable to meet that burden at trial. The valuation evidence does not support a determination that the property is worth less than $250,222.12. Therefore, confirmation of the plan will be denied.

A separate order will issue.

Dated: July 28, 2017

Michael A. Fagone
United States Bankruptcy Judge
District of Maine